**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **PLAINTIFF** |
| **V.** | **CAUSE NO. 3:19-CR-31-CWR-LGI-1** |
| **RODERICK BELL** | **DEFENDANT** |

*and*

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **PLAINTIFF** |
| **V.** | **CAUSE NO. 3:19-CR-97-CWR-FKB** |
| **DENNIS OMAR ESCOBAR-CASTRO** | **DEFENDANT** |

*and*

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **PLAINTIFF** |
| **V.** | **CAUSE NO. 3:20-CR-151-CWR-LGI** |
| **JESUS MIRANDA-ALCANTAR** | **DEFENDANT** |

**<u>ORDER</u>**

These causes are before the Court for the purpose of sanctioning Assistant U.S. Attorney Theodore "Ted" Cooperstein for his serial misrepresentations.

**I.      Factual and Procedural History**

For more than two years now, courts have been concerned about the risk of judicial proceedings transmitting COVID-19 to litigants, attorneys, and the public. Courtrooms are modest, enclosed spaces, and courts require people from all walks of life to be present for all manner of reasons. Prospective jurors are compelled to attend after receiving an official government summons. Criminal defendants are brought to court against their will to answer formal charges of misconduct. Victims are invited to witness the proceedings and offer

statements at their discretion. Members of the press and the public attend to witness the work of our third branch of government. Nobody wants to receive a life-threatening virus because the law called for their presence.

For the safety of all participants, the Board of Judges of this District adopted several Special Orders addressing the Coronavirus pandemic. The orders were based upon relevant data, including scientific, health information, and statistics concerning the spread of the virus. The first order was issued on March 13, 2020, and over the last two years the Board has adopted variations of the order based on then-existing conditions. The Board was deliberate by explaining that it "recognizes that it is impossible to cover all possible contingencies and that the situation remains fluid. This Order is therefore designed to give the presiding officers flexibility to address issues as they arise while implementing necessary safeguards." *See, e.g.*, Special Order #2, No. 3:40-MC-11, Docket No. 53 at 4 (S.D. Miss. Mar. 31, 2020). Our court is currently operating under Special Order #19. *See* No. 3:40-MC-12, Docket No. 16 (S.D. Miss. June 27, 2022).

At times during this pandemic, commensurate with the spread of the virus, this Court has required all persons present in Courtroom 5B to wear a face covering or affirmatively represent that they are vaccinated against COVID-19. The Court has asked this of witnesses, attorneys, participants, the public, and Court staff alike.

In these three matters, Assistant U.S. Attorney Theodore "Ted" Cooperstein told the Court that he was vaccinated. His first representation came on June 22, 2021, in the matter of *United States v. Miranda-Alcantar*, No. 3:20-CR-151. The hearing opened with this colloquy:

> THE COURT: You may be seated. Good morning. This is *United States v. Jesus Miranda-Alcantar,* No. 3:20-cr-151-CWR-LGI. The first question that I have is, I'm here in the courtroom without a mask because I've been fully vaccinated, and so has everybody on the Court staff. I need a representation from counsel for the government and the agent. Are you fully vaccinated, sir?
> AGENT RUSH: Yes.

> THE COURT: All right. Mr. Cooperstein?
> MR. COOPERSTEIN: Yes, sir?
> THE COURT: You're fully vaccinated?
> MR. COOPERSTEIN: (Nods head affirmatively).
> THE COURT: All right. Thank you.

Tr. at 2. The Court accepted Mr. Cooperstein's nod as an affirmation of his vaccination status.

Accordingly, he was permitted to engage in the hearing without a mask.

The second occurrence was on June 29, 2021, in *United States v. Bell*, No. 3:19-CR-31.

Mr. Cooperstein called the case:

> MR. COOPERSTEIN: We're here today on a change of plea hearing. I'm Ted Cooperstein representing the United States Attorney's Office. The defendant is present in person in the court, along with his counsel, Edward Blackmon, Jr., Esquire.
> THE COURT: Okay. Thank you, Mr. Cooperstein. As is the Court's regular practice, I announce that I've been fully vaccinated and so have my staff. Mr. Blackmon and Mr. Bell and the parties, the individuals here were in the court in the previous matter, and they've already advised the Court of their vaccination status. And because you're not wearing a mask, Mr. Cooperstein, on the record, could you tell me if you're fully vaccinated?
> MR. COOPERSTEIN: I am also, Judge.
> THE COURT: Are you fully vaccinated is the question?
> MR. COOPERSTEIN: Yes, sir.
> THE COURT: Okay. Thank you.

Tr. at 3.

The third and final representation occurred on July 8, 2021, during the sentencing in

*United States v. Escobar-Castro*, No. 3:20-CR-151.

> THE COURT: Let me make this representation first. The Court does not have on a mask because I am fully vaccinated, as well as the staff here. And I do ask for a representation of those who are in the courtroom without a mask if they are fully vaccinated. So I'll start with the probation officer.
> PROBATION OFFICER: Yes, Your Honor.
> THE COURT: All right. Mr. Cooperstein, and I know you've answered this question before, but --
> MR. COOPERSTEIN: Yes, sir.
> THE COURT: -- fully vaccinated? Mr. Sellers?
> MR. SELLERS: Yes, sir, Your Honor.

> THE COURT: Now, let's go through -- this is *United States v. Dennis Omar Escobar-Castro*. No. 3:19-cr-97-CWR-FKB. And we are here for sentencing in this matter today.

Tr. at 2-3. The Court again took Mr. Cooperstein's "Yes, sir" as an affirmative response to its question.[1]

As it turns out, these representations were false. During the October 6, 2021 sentencing in *United States v. Bell*, Mr. Cooperstein changed his answer.

> MR. COOPERSTEIN: Ted Cooperstein for the United States calling the case of United States of America versus Roderick Bell. The case number is 3:19-cr-31-CWR-LGI. We're here for a sentencing hearing. The defendant is present in the court, and he's accompanied by his defense counsel, the Honorable Edward Blackmon.
>
> THE COURT: Okay. Thank you, Mr. Cooperstein. The Court is fully masked. My staff fully vaccinated. Can I get a representation from counsel for defendant -- I see you have on your mask. Are you fully vaccinated, Mr. Blackmon?
>
> MR. BLACKMON: I'm triple vaccinated.
>
> THE COURT: Oh, you got your booster, huh?
>
> MR. BLACKMON: Yeah.
>
> THE COURT: Mr. Bell, the defendant?
>
> THE DEFENDANT: No, sir, I'm not vaccinated.
>
> THE COURT: Okay. All right. Mr. Cooperstein?
>
> MR. COOPERSTEIN: I'm not comfortable discussing my personal medical history, Your Honor, but I am wearing my mask per the Court's rules.
>
> THE COURT: What's your representation to the Court, sir?
>
> MR. COOPERSTEIN: Sir, I am not vaccinated. I have an exemption request pending with my employer, so I'm wearing the mask as required.
>
> THE COURT: Okay. All right. Thank you. Everyone else is. Are you ready to proceed?

---

[1] On these three occasions, Special Order #14 was in place. The Order allowed those who represented that they were fully vaccinated as defined by the Centers for Disease Control and Prevention to enter the building without masks or face coverings and without social distancing. *See* No. 3:40-MC-11, Docket No. 87 at 1 (S.D. Miss. May 17, 2021). "Notwithstanding the foregoing," the Order explained, "each presiding judge retains the authority to require masks or other face coverings and social distancing in his or her courtroom and chambers." *Id.* It is not uncommon that during proceedings, particularly guilty plea and sentencing hearings, issues arise which require counsel and the probation officer to have off-the-record, private and intimate conversations concerning a newly-discovered wrinkle in the case. When they are huddled up, there is no distance among the persons; they are whispering so that their conversation is heard only by its participants. Obviously, the need for mask wearing in this situation is at its zenith. Requiring the continued use of masks or other face coverings was buttressed by this Court's view that so much was unknown about the virus. *See United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241, at *7 n.14 (S.D. Miss. May 1, 2020) ("[W]e simply don't know all that we don't know about this disease."). We are still learning more about the disease. *See* Rob Stein, *What's Ailing Long COVID Patients? A New Federal Study Looks for Clues*, May 24, 2022, https://www.npr.org/sections/health-shots/2022/05/24/1100505822/whats-ailing-long-covid-patients-a-new-federal-study-looks-for-clues.

MR. COOPERSTEIN: The Government is prepared and ready, Your Honor, yes.

Tr. at 3-4.[2]

Three weeks later, the Court issued an Order to Show Cause in each of these cases. The Order recited counsel's various representations and noted that it was not clear "which representation was true and which was false." Mr. Cooperstein was ordered to "explain why he should not be sanctioned for making one or more misrepresentations to the Court."

Mr. Cooperstein's counsel responded to the Order to Show Cause with an apology. "Mr. Cooperstein sincerely, and without reservation, apologizes for his lack of candor with the Court regarding his COVID-19 vaccination status," it said. The brief attributed Mr. Cooperstein's misrepresentations to "poor judgment," and asked for any resulting sanctions to be modest.

An in-person hearing was then held on April 1, 2022. Mr. Cooperstein offered a short apology to all present in the courtroom. His counsel then presented argument on the various consequences Mr. Cooperstein's actions have already had, including the opening of a Department of Justice Office of Professional Responsibility investigation into his misrepresentations. Counsel again requested that sanctions be modest.

The U.S. Attorney, the First Assistant and Criminal Chief, the Ethics Officer, and the Professional Responsibility Officer attended the hearing, as directed by the Court. On advice of counsel, the U.S. Attorney, speaking for the officials, demurred when asked to opine on an appropriate sanction for his colleague's misrepresentations. He offered no statement about the circumstances. Unknown, for example, are when the office first became aware that Mr. Cooperstein made misrepresentations to a tribunal; what steps the office took to address this

---

[2] By this time, Special Order #15 was adopted, vacating Special Order #14. It required, in relevant part, that "[a]ll individuals entering courthouses in this district, including members of the public, litigants, attorneys, and court personnel, regardless of vaccination status, must wear a face mask, face shield or other face covering while in public areas of each building." *See* No. 3:40-MC-11, Docket No. 91 at 1 (S.D. Miss. Aug. 5, 2021).

issue; and whether it took any steps before the Court issued its Orders to Show Cause. These issues deserved to be explored, but the U.S. Attorney explained that he was advised by Main Justice that he should offer no comment.

This Order followed.

## II.   Legal Standard

"[A] federal court has the power . . . to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citation omitted). "When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." *Carroll v. Jaques Admiralty L. Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997) (citations omitted).

To trigger such sanctions, counsel must engage in "bad faith conduct in litigation." *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995). The Fifth Circuit has found bad faith to encompass "intended deceit." *Maguire Oil Co. v. City of Houston*, 143 F.3d 205, 212 (5th Cir. 1998). "When bad faith is patent from the record and specific findings are unnecessary to understand the misconduct giving rise to the sanction," however, "the necessary finding of 'bad faith' may be inferred." *In re Sealed Appellant*, 194 F.3d 666, 671 (5th Cir. 1999); *see also In re Monteagudo*, 536 F. App'x 456, 460 (5th Cir. 2013) (affirming order finding that attorney's "prior untruthful statements to the Court" and "lack of candor and his untruthfulness" amounted to bad faith).

The Court's inherent powers "must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44 (citation omitted). Specifically, "the sanction chosen must employ the least possible power adequate to the end proposed." *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996) (citation and quotation marks omitted).

6

Inherent power includes "the power to sanction attorney or party misconduct," "the power to enter a default judgment," "fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence." *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995) (citations omitted).

## III.   Discussion

"Case after case can be cited in support of the general proposition that, as officers of the court, attorneys owe a duty to the court that far exceeds that of lay citizens." *Howell v. State Bar of Texas*, 843 F.2d 205, 207 (5th Cir. 1988). The Fifth Circuit has found "entirely appropriate the court's expectations of a heightened standard of conduct by a litigant who is also an attorney. We applaud that decision." *Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030, 1033 (5th Cir. 1990).

> As an officer of the court, a member of the bar enjoys singular powers that others do not possess; by virtue of admission, members of the bar share a kind of monopoly granted only to lawyers. Admission creates a license not only to advise and counsel clients but to appear in court and try cases; as an officer of the court, a lawyer can cause persons to drop their private affairs and be called as witnesses in court, and for depositions and other pretrial processes that, while subject to the ultimate control of the court, may be conducted outside courtrooms. The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice.

*In re Snyder*, 472 U.S. 634, 644-45 (1985). Only lawyers are given the keys to the courthouse to seek justice, to do justice, and vindicate the rights of others. Only lawyers are granted that power.

Here, the misrepresentations are more concerning than they would be coming from an ordinary attorney, much less an ordinary litigant.

Mr. Cooperstein is no ordinary lawyer. He is an Assistant United States Attorney (AUSA). That means he is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at

7

all." *Berger v. United States*, 295 U.S. 78, 88 (1935). We expect the best of him and his colleagues, privileged as they are to represent the interests of the United States of America.[3]

In these instances, however, Mr. Cooperstein fell short of those expectations.

At the hearing, the undersigned discussed the heightened standards we apply to Department of Justice attorneys. The Court quoted from the famous *Berger* decision, as it has done in this Order. The Court also quoted Justice Jackson's famous speech, "The Federal Prosecutor," to highlight just how powerful the word of an AUSA can be. Here is the excerpt that rings out today:

> The prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous. He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimations. Or the prosecutor may choose a more subtle course and simply have a citizen's friends interviewed. The prosecutor can order arrests, present cases to the grand jury in secret session, and on the basis of his one-sided presentation of the facts, can cause the citizen to be indicted and held for trial. He may dismiss the case before trial, in which case the defense never has a chance to be heard. Or he may go on with a public trial. If he obtains a conviction, the prosecutor can still make recommendations as to sentence, as to whether the prisoner should get probation or a suspended sentence, and after he is put away, as to whether he is a fit subject for parole. While the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst.

Robert H. Jackson, Attorney General of the United States, Speech to the U.S. Department of Justice, The Federal Prosecutor (Apr. 1, 1940), *available at* https://www.justice.gov/ag/speeches-attorney-general-robert-houghwout-jackson.

---

[3] For those who, like me, have had the privilege of standing before the Court to announce that they are here representing the United States of America, it is special. United States District Judge Michael H. Simon captures it best: "One of the most memorable days during this entire time (after my wedding 35 years ago and the birth of my two children) was the first time I stood in a federal courtroom, stated my name, and announced, 'representing the United States of America.'" Simon, *A View from the Bench: What a Judge Expects*, 68 DOJ J. Fed. L. & Prac. 47, 47 (2020). "When AUSAs stand in federal courtrooms and announce they represent 'the United States of America,' they represent all of us." *Id.* at 48.

Former professor and now Third Circuit Judge, Stephanos Bibas, has noted that "[n]o government official in America has as much unreviewable power and discretion as the prosecutor." Stephanos Bibas, *Prosecutorial Regulation Versus Prosecutorial Accountability*, 157 U. Penn. L. Rev. 959, 960 (2009). Many other scholars have reached similar conclusions. *See, e.g.*, William J. Stuntz, *Plea Bargaining and Criminal Law's Disappearing Shadow*, 117 Harv. L. Rev. 2548, 2549 (2004) ("[T]he law that determines who goes to prison and for how long – is chiefly written by prosecutors, not by legislators or judges."); David Alan Sklansky, *The Nature and Function of Prosecutorial Power*, 106 J. Crim. L. & Criminology 473, 480 (2016) ("The starting point for virtually every discussion of prosecutors in the United States is their tremendous clout."); Rachel E. Barkow, *Institutional Design and the Policing of Prosecutors: Lessons from Administrative Law*, 61 Stan. L. Rev. 869, 870 (2009) ("It is hard to overstate the power of federal prosecutors"); Angela J. Davis, *In Search of Racial Justice: The Role of the Prosecutor*, 16 N.Y.U. J. Legis. & Pub. Pol'y 821, 832 (2013) ("Prosecutors are the most powerful officials in the criminal justice system.").

Though they have this power, prosecutors are also ministers of justice. *See, e.g.*, ABA Model Rule of Professional Conduct 3.8 cmt [1] ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."). "This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons." *Id*.

> An AUSA must know and appreciate the high standards to which the AUSA will be held. Everything that an AUSA does can affect how the public will perceive our government, including its fairness, its justice, its commitment to the rule of law, its compassion, its empathy, its mercy, its decency, and its reasonableness. And it is more than just perception. What an AUSA does is a critical component of whether

the American system of justice is in fact fair, just, committed to the rule of law, compassionate, empathetic, merciful, decent, and reasonable.

Michael H. Simon, *A View from the Bench: What a Judge Expects*, 68 DOJ J. Fed. L. & Prac. 47, 52 (2020).

It is because Assistant U.S. Attorneys' words have such power that we expect those words to be truthful. And here, Mr. Cooperstein's representations were false. They were lies. This conduct meets prior cases' definition of "bad faith." And it is conduct meriting sanctions.

The remaining question is how to structure a sanction that adequately punishes Mr. Cooperstein *and* deters similar misconduct, not just by Mr. Cooperstein, but other lawyers, including AUSAs, in the future. *See, e.g.*, *Merriman v. Security Ins. Co. of Hartford*, 100 F.3d 1187, 1194-95 (5th Cir. 1996) (finding that Rule 11 sanctions not only dissuade the lawyer before the court from future sanctionable conduct, but dissuade others in the future); *Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 803 (5th Cir. 2003) (finding that Rule 11 sanctions have the goals of specific and general deterrence).

Other than the justice system, there is no identifiable victim in this matter. The defendants have not incurred additional attorney's fees or borne the brunt of patently frivolous litigation as a result of Mr. Cooperstein's actions; by now, they have been sentenced appropriately. Nor does the Clerk of Court particularly need the money.

Precedent instead suggests that a $6,000 penalty – comprised of $1,500 for the first lie, $2,000 for the second, and $2,500 for the third – would constitute appropriate punishment and deterrence. *See Carroll*, 110 F.3d at 293 n.3 (affirming $7,000 sanction for litigation misconduct); *Blanco River, L.L.C. v. Green*, 457 F. App'x 431, 440 (5th Cir. 2012) (affirming $4,000 sanction); *In re First City Bancorporation of Texas Inc.*, 282 F.3d 864, 867 (5th Cir. 2002) (affirming $25,000 sanction for "wholly unprofessional conduct").

10

Guided by the argument presented by Mr. Cooperstein's counsel, the Court determines that Mr. Cooperstein's sanction should go toward his personal support of the Mississippi Bar's James O. Dukes Professionalism Program. This is a half-day program conducted for entering law students at the University of Mississippi and Mississippi College law schools. *See* James O. Dukes Professionalism Program, *Law School Orientation on Professionalism, Student Materials*, *available at* https://law.olemiss.edu/wp-content/uploads/2020/08/2020-MB-Dukes-Program-Student-Materials.pdf. "The Orientation Program brings lawyers and judges to both law schools in Mississippi to participate with entering law students in discussions of professionalism and civility." *Id.* at 1. Mr. Cooperstein must pay $2,500 to the Mississippi Bar within 30 days of this Order. The Bar together with the law schools will have the discretion to make the best use of the sanction. The balance shall be paid within one year of this Order.

The Court expressly finds that this penalty is the lowest penalty necessary in this situation. It is an appropriate amount. A $6,000 fine to be paid over this period should be readily affordable to Mr. Cooperstein, who has a pending lawsuit against his professional liability insurer that, if successful, could reap him a substantial windfall.[4] If anything, $6,000 is at the bottom end of the spectrum of possible punishments.

## IV.   Conclusion

"A judge expects that an AUSA will always do the right thing, in the right way, and for the right reason. And if that ever fails to be the case, a judge expects that the AUSA will candidly and timely inform the court of the error and do what is necessary to correct it." Simon, 68 DOJ J. Fed. L. & Prac. at 60. Because that did not happen here, AUSA Ted Cooperstein is sanctioned in

---

[4] Mr. Cooperstein may in fact "come out ahead," financially speaking, from this disciplinary proceeding.

the amount of $6,000.

**SO ORDERED**, this the 7th day of July, 2022.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE